UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____

LEONARD C. JEFFERSON,     )
                         )
       Plaintiff,    )
                         )
    v.             )    C.A. No. 17-439 WES
                         )
GINA RAIMONDO, Governor of the  )
State of Rhode Island and the   )
Providence Plantations; ASHBEL T. )
WALL, Director of Rhode Island  )
Department of Corrections [RIDOC]; )
BARRY WEINER, Assistant Director  )
of Rehabilitative Services at    )
RIDOC; MATTHEW KETTLE, Associate  )
Director at RIDOC; DEPUTY WARDEN  )
ACETO, of the Maximum Security   )
Unit [Max] of RIDOC; CAPTAIN    )
DUFFY, LIEUTENANTS AMARAL and    )
BURT, Superior Officers at Max;  )
CORRECTIONAL OFFICERS PAOLELLO and )
CROWLEY; JENNIFER CLARKE, Medical )
Program Director at RIDOC; and   )
SIMON MELNICK, Treating Physician )
at RIDOC,                 )
                         )
       Defendants.   )

_____

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

    Before the Court is Defendants' Motion[1] to Dismiss (ECF No.

14) Plaintiff Leonard C. Jefferson's Complaint (ECF No. 1).

---

    [1] All Defendants bring this Motion, except Drs. Jennifer
Clarke and Simon Melnick. Rhode Island Department of Corrections
("RIDOC") Officer Crowley is named as a defendant, in his
individual capacity; and while he is not listed as joining the
Motion, the same attorney who accepted service on behalf of the

Magistrate Judge Patricia A. Sullivan filed a Report and Recommendation ("R&R") (ECF No. 20), recommending that the Motion be granted as to all Counts, but Count V. Magistrate Judge Sullivan recommends, however, that Count V be dismissed only as to the individual claims against Defendants Wall and Kettle, and "all claims against Defendants Raimondo, Duffy, Burt and Paolello should be dismissed." (R. & R. 34.) Plaintiff filed a timely Objection to the R&R ("Objection") (ECF No. 22).

Additionally, after the R&R was filed, Defendants Dr. Jennifer Clarke and Dr. Simon Melnick ("Medical Defendants") separately moved to dismiss (ECF No. 23). After careful review, the Court accepts the R&R. The Court therefore grants in part and denies in part Defendants' Motion to Dismiss. The Court also grants Medical Defendants' Motion to Dismiss.

I. Discussion

A. Defendants'[2] Motion to Dismiss

At the outset, Plaintiff does not object to the recommendation that Counts VI-IX be dismissed. (See Obj. 1.) As to Counts I-V, however, Plaintiff raises twenty-one objections. (See generally id.) Objections must "specify the findings and/or recommendations

---

other RIDOC Defendants accepted service on behalf of him. (R. & R. 1 n.1, ECF No. 20.)

[2] To avoid confusion, the phrase "Defendants" refers to those defendants involved in the initial Motion to Dismiss (ECF No. 14) and R&R.

to which objection is made and the basis for the objection."  DRI LR Cv 72 (d)(2).  The Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).

However, "this Court need not 'consider frivolous, conclusive, or general objections.'"  <u>Seymour v. Cont'l Airlines, Inc.</u>, No. 09-526-ML, 2010 WL 3894023, at *1 (D.R.I. Oct. 4, 2010) (quoting <u>Espada-Santiago v. Hosp. Episcopal San Lucas</u>, No. 07-2221(ADC), 2009 WL 702350, at *1 (D.P.R. Mar. 11, 2009)); <u>see also</u> <u>Sackall v. Heckler</u>, 104 F.R.D. 401, 403 (D.R.I. 1984) (holding objections need to be "well grounded in fact and . . . warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law").

Here, Plaintiff places the R&R under a microscope, complaining line-by-line about Magistrate Judge Sullivan's analysis.  (<u>See generally</u> Obj.)  For example, Plaintiff begins with the statement that Defendants are in "sham-compliance" with his prior case's settlement agreement in <u>Jefferson v. Piccirillo</u>, No. 14-475-M-LDA, 2015 WL 3700796 (D.R.I. June 12, 2015).  (<u>Id.</u> at 1; <u>see also</u> R. & R. 3.)  Further, although Plaintiff complains about res judicata barring his claims, he concedes in an earlier objection that, "the claims set forth in Counts I thru IV of the <u>Raimondo</u> Complaint may be similar in kind to those resolved by the Piccirillo settlement." (Obj. at 5.)  Later, Plaintiff objects to

3

the word "extensive" describing the "inspection of Max [that]
occurred on April 24, 2017." (Id. at 7.) Plaintiff's scattershot
attacks on the R&R lack merit. And to the extent that Plaintiff
has raised objections not specifically addressed below, the Court
has reviewed all arguments and "has determined that they are
without merit." See Seymour, 2010 WL 3894023, at *4. This Court's
de novo review leads it to the same conclusion as Magistrate Judge
Sullivan, and for the reasons she articulated, Defendants' Motion
must be granted.

      1.   Eighth Amendment

Plaintiff attacks the R&R's finding that "the complaint does
not allege that the occasional chilly temperatures . . . amount to
a 'dangerously cold' condition." (Obj. 5-6 (quoting R. & R. 11).)
Citing Sampson v. Berks County Prison, 171 F. App'x 382 (3d Cir.
2006), Plaintiff argues that low cell temperatures in combination
with other factors, such as length of confinement, create a
deprivation of human needs sufficient to state a claim under the
Eighth Amendment. (See id. at 6.) Magistrate Judge Sullivan's
analysis, however, which highlights the Court's prior decision in
Jefferson v. Pepin, C.A. No. 16-016S, 2017 WL 5197880 (D.R.I. Jan.
26, 2017), is correct. (See R. & R. 15-16.) In Pepin, the same
Plaintiff alleged an Eighth Amendment violation as to cold
temperatures resulting from proximity to the HVAC system, which
the Court rejected, stating that he had not plead that his cell

4

was "dangerously cold." (Id. at 15); see also Pepin, 2017 WL 5197880, at *4-5. As Magistrate Judge Sullivan explained, in this case Plaintiff once again did not plead that his cell was "dangerously cold," and his similar allegations are inadequate to "permit[] the inference that the cold . . . deprived him of the minimal civilized measure of life's necessities." (R. & R. 16 (quoting Restucci v. Clarke, 669 F. Supp. 2d 150, 155-56 (D. Mass. 2009)).

Similarly, Plaintiff objects to the finding that "the mere presence of mold or occasional temperatures below 65° are insufficient to indicate an objectively serious deprivation of life's necessities." (Obj. 12 (quoting R. & R. 14).) Additionally, Plaintiff objects to the recommendation that the Complaint be dismissed for failure to state a claim for lack of an allegation or evidence supporting "deliberate indifference." (Id. at 17-18.)

To prevail on an Eighth Amendment claim, "a plaintiff must satisfy both a subjective and objective inquiry." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011). As to Plaintiff's arguments about mold, "[e]ven if the Court were satisfied with the adequacy of Plaintiff's pleading of conditions causing objectively serious harm, Plaintiff's Eighth Amendment claims are nevertheless subject to dismissal because the Complaint fails to plead deliberate indifference." (R. & R. 17.)

Plaintiff's Complaint shows the opposite, citing the multiple times he has been able to see doctors "who examined, tested and treated him for the allergies and illnesses he claims were caused by these conditions." (Id.) "[P]laintiff[] disagree[s] with the Magistrate's factual findings but offer[s] nothing to bolster [his] objections except [his] own interpretation of the evidence." Monfort-Rodriguez v. Hernandez, 286 F. Supp. 2d 119, 121 (D.P.R. 2003). Therefore, Plaintiff's Objections are denied.[3]

   B.   Medical Defendants' Motion to Dismiss[4]

   Medical Defendants allege that Count IV of Plaintiff's Complaint should be dismissed because it is barred by res judicata.

---

   [3]   With respect to Count V, the Court grants Plaintiff leave to amend his Complaint to "address ongoing limitations (i.e., substantial burdens) which RIDOC continues to impose on Plaintiff's exercise of religion." (See Obj. 29.)

   [4]   The Court notes that, prior to moving to dismiss, both Medical Defendants filed Answers (ECF Nos. 12, 13) to Plaintiff's Complaint on November 15, 2017. "Federal Rule 12(b) states that if a party decides to raise any of the seven enumerated defenses by motion, it 'must be made before pleading if a responsive pleading is allowed.'" 5C Charles Alan Wright et al., Federal Practice and Procedure § 1361 (3d ed. 2014) (quoting Fed. R. Civ. P. 12(b)). However, because Medical Defendants in their Answers assert that Plaintiff fails to set forth facts sufficient to state a claim (see Def. Melnick Answer 9; Def. Clarke Answer 9-10), this Court may treat their post-Answer Rule 12(b)(6) Motion to Dismiss as a Motion for Judgment on the Pleadings under Rule 12(c). See Lu v. Menino, 98 F. Supp. 3d 85, 93 (D. Mass. 2015). And, despite this procedural snafu, the Court's analysis of Medical Defendants' Motion is unchanged. See Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) ("A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss."); see also Lanigan v. Vill. of E. Hazel Crest, 110 F.3d 467, 470 n.2 (7th Cir. 1997) ("[A]s a matter of motions practice, a 12(b)(6) motion

(See Mem. in Supp. Defs. Melnick & Clarke's Mot. to Dismiss ("Med. Defs.' Mem.") 3.) Further, as Magistrate Judge Sullivan articulated, "the claim preclusion doctrine of res judicata, coupled with the effect of the release arising from the Piccirillo settlement agreement, together require that Counts I-IV should be dismissed in their entirety." (R. & R. 23-24; see also Med. Defs.' Mem. 3-4 (citing R&R's dismissal of Count IV as to other Defendants to support application of res judicata).)

Although the R&R does not encompass Medical Defendants, its reasoning applies to their Motion with equal force, and the claims against these defendants will be dismissed for the same reasons. (See generally R. & R.) Therefore, the Court grants Medical Defendants' Motion to Dismiss.

II. Conclusion

For the above reasons, this Court ACCEPTS the R&R (ECF No. 20) and adopts its reasoning and recommendations. Therefore, Defendants' Motion to Dismiss (ECF No. 14) is GRANTED in part, and DENIED in part. Additionally, Medical Defendants' Motion to Dismiss (ECF No. 23) is GRANTED. To avoid complete dismissal of his case, Plaintiff may file an amended complaint that remedies

---

to dismiss made after an answer has been filed can be considered as a 12(c) motion for judgment on the pleadings and can be evaluated under the same standard of review as a 12(b)(6) motion.") (citation omitted).

the deficiencies outlined herein and in the R&R within thirty days

of this Memorandum and Order.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  August 15, 2018

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

LEONARD C. JEFFERSON,        :
           Plaintiff,      :
                        :
      v.              :        C.A. No. 17-439WES
                        :
GINA RAIMONDO, Governor of the   :
State of Rhode Island;        :
ASHBEL T. WALL, Director of Rhode  :
Island Department of Corrections   :
(RIDOC); BARRY WEINER, Assistant  :
Director of Rehabilitative Services at  :
RIDOC; MATTHEW KETTLE, Associate :
Director at RIDOC; DEPUTY WARDEN  :
ACETO, of the Maximum Security Unit  :
(Max) of RIDOC; CAPTAIN DUFFY;   :
LIEUTENANTS AMARAL and BURT,   :
Superior Officers at Max;      :
CORRECTIONAL OFFICERS      :
PAOLELLO and CROWLEY; JENNIFER  :
CLARK, Medical Program Director at   :
RIDOC; and SIMON MELNICK,    :
Treating Physician at RIDOC;    :
             Defendants.     :

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

       This matter is before the Court on the Motion to Dismiss (ECF No. 14) brought by some but not all of the defendants[1] named in this sixty-five-page, 452-paragraph, nine-Count "Verified Complaint with Jury Demand." ECF No. 1 ("Complaint"). Plaintiff Leonard C. Jefferson is an

---

[1] The Motion is brought on behalf of Defendant Gina Raimondo, sued in her individual capacity and official capacity as Governor. Also joining the motion are eight officials of the Rhode Island Department of Corrections ("RIDOC"), sued individually and officially, except for RIDOC Correctional Officer Paolello, who is sued only in his official capacity (collectively, "RIDOC Defendants"). In this report and recommendation, the defendants who join in the Motion are referred to as the "moving Defendants" or "Defendants." RIDOC Correctional Officer Crowley is named as a defendant (sued only in his individual capacity), but is not listed as joining in the Motion although service on him was accepted by the same attorney who accepted service on the other RIDOC Defendants. The two medical defendants, RIDOC Medical Program Director Dr. Jennifer Clarke and Dr. Simon Melnick, did not join the Motion.

inmate at the Adult Correctional Institutions ("ACI"). He is serving a life sentence without parole in the Maximum Security Unit ("Max"). In his *pro se* Complaint, he has joined together the following three unrelated claims:[2]

1. Counts I-IV challenge conditions of confinement at Max, which Plaintiff claims adversely affect his health, in violation of the Eighth and Fourteenth Amendments:

    a. Counts I-II allege that RIDOC policy requires that windows in Max are opened from May until September or early October, sometimes exposing Plaintiff to below minimal "Public Health standards" temperatures, yet Plaintiff was also prohibited by RIDOC's summer uniform policy from wearing warm clothing; and

    b. Counts III-IV allege that RIDOC has allowed Max to be contaminated with black mold, but has refused to provide Plaintiff with the skin testing that he wanted to identify the toxin causing his allergies.

2. Counts V-VII allege that RIDOC suspended weekly Muslim group prayer services ("Jumu'ah services") (apparently while looking for an Imam to lead them) for months during which Christian and Catholic services were conducted, as well as that RIDOC policy prohibited the wearing of a kufi at the 2017 Iftar ritual of Ramadan, in violation of the Free Exercise clause of the First Amendment and (as to Count VI) the Equal Protection clause of the Fourteenth Amendment.

3. Counts VIII-IX allege that RIDOC imposed a six-day discipline on Plaintiff in violation of the Morris Rules and contrary to the Due Process clause of the Fourteenth Amendment, which was done in retaliation for Plaintiff's artwork and for filing two lawsuits in 2016.

---

[2] Linked to Plaintiff's allegation that he has complied with the exhaustion requirement in the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(h), the Complaint also devotes almost three pages to a superfluous discussion of Plaintiff's theory that he is not a prisoner as defined by the PLRA because his Rhode Island parole revocation hearing was not properly conducted. ECF No. 1 ¶¶ 327-39; ECF No. 1-1 at 51. This issue is the subject of a post-conviction relief proceeding presently pending before the Rhode Island Supreme Court. ECF No. 1 ¶ 337 (referring to Jefferson v. State of Rhode Island, No. SU 2015-0232 (PM 2014-3816)). This Court rejected Plaintiff's PLRA argument in Jefferson v. Wall, C.A. No. 16-652WES, 2017 WL 6459447, at *1 & n.4 (D.R.I. Dec. 18, 2017). Because it is not pertinent to the Motion, Plaintiff's PLRA argument will not be discussed further in this report and recommendation.

All of these claims are asserted pursuant to 42 U.S.C. § 1983.  Plaintiff seeks declaratory relief, injunctive relief and compensatory and punitive damages.

The moving Defendants urge the Court to dismiss the Complaint in its entirety for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and, as to the Morris Rules claim in Count VIII, based on the lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). Relatedly, they ask the Court to examine the viability of the claims in light of the minimal pleading requirements in Fed. R. Civ. P. 8(a), as interpreted by <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  Defendants Raimondo and Duffy make a separate pitch for dismissal because the Complaint lacks plausible facts sufficient to expose them to individual or official capacity liability.[3]  Finally, focusing on the doctrine of *res judicata*, the moving Defendants ask the Court to dismiss the conditions-of-confinement claims in Counts I-IV because they are precluded by the settlement of essentially identical claims on April 15, 2015, which settlement was merged into final judgment on the merits in <u>Jefferson v. Piccirillo</u>, No. 14-475-M-LDA, 2015 WL 3700796, at *2 (D.R.I. June 12, 2015) (holding settlement terminating litigation "produces a result equivalent to a dismissal 'with prejudice'"), <u>aff'd</u>, (1st Cir. Apr. 13, 2016) (holding that settlement precludes Plaintiff from "turning around and re-filing some of the very same claims based on pre-settlement acts or omissions of defendants"), <u>first motion to reopen denied</u>, (D.R.I. July 26, 2016) (finding defendants "in compliance with settlement agreement"), <u>second motion to reopen denied</u>, (D.R.I. Dec. 14, 2016) (finding defendants "in compliance with the settlement agreement") (hereinafter "<u>Piccirillo</u>").

---

[3] Doubtless because Captain Duffy is not mentioned in the fact portion of the Complaint, but is only listed as a party and in two conclusory paragraphs, ECF No. 1 ¶¶ 8, 341, 449, Plaintiff agrees that he should be dismissed.  ECF No. 16-1 at 28.  I include his dismissal in my recommendations in the Conclusion; he will not be mentioned again in this report and recommendation.

For the reasons explained below, I recommend that the Motion be granted in part and denied in part.

I. **Background**[4]

Plaintiff Leonard Jefferson is serving a life sentence imposed in 1974 for a first degree murder committed during an attempted robbery in Providence, Rhode Island. ECF No. 1 ¶ 331; see Jefferson v. State, 472 A.2d 1200, 1206 (R.I. 1984) (affirming denial of post-conviction relief). After he was convicted, he served a portion of the 1974 sentence and was released on parole in 1985. ECF No. 1 ¶¶ 332-34. He relocated to Pennsylvania, where he was convicted in 1993 of aggravated assault and sentenced to twenty years. While Plaintiff was serving his Pennsylvania sentence, Rhode Island's Parole Board revoked parole. ECF No. 1 ¶¶ 334-36. In November 2013, after he completed the Pennsylvania sentence, Plaintiff was returned to Rhode Island to serve the remainder of the 1974 life sentence. RIDOC imprisoned him in Max, which he describes in his opposition brief as the "Old Maximum Security Building," where he has remained since. ECF No. 16-1 at 2-3. Plaintiff is now almost seventy years old. See ECF No. 1 ¶ 112.

Some of Plaintiff's prior litigation in this Court is pertinent to the issues posed by the Motion.

In the 1970s and 1980s, Plaintiff was a named plaintiff in some of the cases that challenged conditions of confinement at Max following the decision (Morris v. Travisono, 310 F. Supp. 857, 871-74 (D.R.I. 1970)), which memorialized the State's agreement to adopt certain procedures that have come to be known as the Morris Rules. E.g., Jefferson v. Moran, 563 F.

---

[4] The background is drawn from the Complaint and its attachments, as well as from Plaintiff's prior lawsuits, including both reported decisions and other material in the public dockets. Mindful of the lenity required by Plaintiff's *pro se* status, I have also occasionally included background Plaintiff recites in his opposition to the Motion (ECF No. 16-1), but omitted from the Complaint itself.

Supp. 227 (D.R.I. 1983); <u>Jefferson v. Southworth</u>, 447 F. Supp. 179, 191 (D.R.I. 1978), <u>aff'd sub nom.</u>, <u>Palmigiano v. Garrahy</u>, 616 F.2d 598 (1st Cir. 1980). Throughout the current Complaint (ECF No. 1 ¶¶ 38-41, 159, 376-77) are allusions to the forty-year-old findings from these cases made by the late District Judge Raymond Pettine that Max was unfit for human habitation in the 1970s, based among many other reasons on the cold temperatures and mold in the shower area. <u>E.g.</u>, <u>Southworth</u>, 447 F. Supp. at 184 ("cold temperature level . . . as being 49 degrees"; windows open because cold preferable to "stench of cell area"); <u>Palmigiano v. Garrahy</u>, 443 F. Supp. 956, 961-62 (D.R.I. 1977) (temperature in 50° range in winter and spring; mold and mildew in shower area). However, Plaintiff has not included any plausible facts in his 2017 Complaint permitting the inference that the shocking conditions from the 1970s have persisted unchanged to the present, apart from the indisputable fact that today Max is an even older building. <u>See</u> ECF No. 1 ¶ 113 (in 2014, physician linked likelihood of presence of allergens like mold to age of Max; "this old building").

More recently, in 2014, Plaintiff filed <u>Piccirillo</u>. Among other defendants, he named Director Wall, who is also a RIDOC Defendant in the instant Complaint. In pertinent part, the <u>Piccirillo</u> complaint asserted Eighth Amendment conditions-of-confinement claims grounded in the allegations that (1) RIDOC policy required that, each year, the heat be turned off from April until October, resulting in temperatures as low as 45°, yet its "summer uniform policy" also mandated that light clothing be worn, causing Plaintiff to suffer adverse health effects (including pneumonia, lung congestion, leg pain and osteoarthritis); and (2) Plaintiff suffered from respiratory symptoms that RIDOC physician Dr. Vohr advised were likely caused by environmental allergens at Max, yet Dr. Vohr prescribed allergy medication and refused to order testing to identify the specific allergen. <u>Piccirillo</u> at ECF No. 1 ¶¶ 115-41, 156-58, 162-64, 175-

77; ECF No. 29 ¶ 15.  In his March 2015 supplement to his <u>Piccirillo</u> complaint, Plaintiff alleged that RIDOC staff refused his requests for permission to wear warmer clothing unless on the advice of a medical provider, and that, following an examination, RIDOC's physician advised that, despite his age, there was no medical reason for Plaintiff to wear more clothing than RIDOC policy permitted.  <u>Piccirillo</u> at ECF No. 29 ¶¶ 13, 19-20, 30-35.

<u>Piccirillo</u> ended in a binding settlement following an all-day mediation on April 15, 2015, conducted pursuant to Order of the Court by the Court's Alternative Dispute Resolution Administrator.  <u>Piccirillo</u> at Text Order of Mar. 4, 2015; 2015 WL 3700796, at *1.  The resulting settlement agreement addressed Plaintiff's concerns about his need for extra clothing to cope with the cold temperatures, as well as his health concerns about respiratory and allergy issues in a forward-looking fashion, by requiring RIDOC to take specified actions post-settlement, while Plaintiff gave up his right to maintain the suit or to recover money damages.  <u>Piccirillo</u> at ECF No. 40-1 (settlement term sheet).  This termination of <u>Piccirillo</u> was found both by this Court, 2015 WL 3700796, at *2, and by the First Circuit, to amount to final judgment on the merits as to all claims.  <u>Piccirillo</u> at ECF No. 64.

After his unsuccessful challenge to the finality of <u>Piccirillo</u>, Plaintiff filed two motions to enforce the settlement agreement.  <u>Piccirillo</u> at ECF Nos. 68, 75.  Each alleged that RIDOC failed to send him to the independent specialists (a board-certified ENT and a board-certified allergist) mandated by the agreement.  After RIDOC filed its response, in each instance, the Court found that Plaintiff had received all of the medical treatment to which he was entitled in that he had been seen at the Rhode Island Hospital ENT clinic in July 2016, he had been examined by a board-certified allergist in August 2016, and he had gone to a board-certified ENT in December 2016.  <u>Piccirillo</u> at Text Orders of July 26, 2016, and Dec. 14, 2016 (finding

RIDOC in compliance). While Plaintiff's motions to enforce are lengthy and detailed, neither made any complaint about RIDOC's compliance with the term of the settlement agreement addressing Plaintiff's claims of cold temperatures and inadequate clothing. Piccirillo at ECF No. 40-1 (settlement agreement required RIDOC "to consider fully and in good faith the issue of inmate clothing at [Max]," as well as that "input from Mr. Jefferson will be considered"). Less than ten months after the second motion to enforce the Piccirillo settlement was resolved, Plaintiff filed the instant Complaint asserting substantially similar claims.

During 2016 (while the two Piccirillo enforcement motions were being litigated), Plaintiff filed two new cases. In the first, Jefferson v. Pepin, C.A. No. 16-016S ("Pepin"), Plaintiff moved to amend his complaint[5] restating a First Amendment challenge over RIDOC's confiscation of his artwork,[6] as well as conditions-of-confinement claims about the "frigid air" in his cell (alleged to have been below 50° daily for four months), the visible mold in the Max shower area, and RIDOC's refusal to perform allergy skin testing, all in violation of the Eighth Amendment. Pepin at ECF No. 27-1 ¶¶ 81-89, 133. Plaintiff voluntarily dismissed this case after the Court adopted a report and recommendation that rejected his proposed amended complaint based on the finding that its filing would be futile because all of its claims were lacking in merit. See Pepin, 2017 WL 5197880, at *4 (D.R.I. Jan. 26, 2017), adopted, 2017 WL 5198181 (D.R.I. Nov. 9, 2017). The court grounded its rejection of the Eighth Amendment claims based on the lack of an allegation that the cell was "dangerously cold," coupled with the

---

[5] Plaintiff filed Pepin pro se, but then engaged an attorney, who filed an amended complaint. After the attorney's amended complaint was challenged by a motion to dismiss, Plaintiff fired the attorney and sought to file another amended complaint, claiming that she had intentionally attempted to "castrate Plaintiff's strong and legitimate claims." Pepin at ECF No. 27 ¶ 7. It is the third version of the pleading that is the subject of the Court's analysis in Jefferson v. Pepin, 2017 WL 5197880, at *6 (D.R.I. Jan. 26, 2017).

[6] According to Pepin, the confiscated artwork claim was probably also futile based on *res judicata* because Plaintiff had litigated the same claim and lost in Superior Court. 2017 WL 5197880, at *6.

lack of plausible facts permitting an inference of deliberate indifference, in light of the pleading's acknowledgment that RIDOC responded to Plaintiff's complaints about the temperature in his cell. Id. at *5. The Court held that the "allegations concerning the temperature of his cell . . . fail[] to state an Eighth Amendment claim as a matter of law." Id. The Court also found that Plaintiff's filing of three versions of the complaint caused RIDOC delay and prejudice in that it imposed "the burden of preparing and filing multiple substantive responses." Id. at *6.

Plaintiff's other 2016 federal court case is still pending. Jefferson v. Wall, C.A. No. 16-652WES ("Wall"). In Wall, Plaintiff argued for his right to wear a kufi at the 2016 and 2017 Ramadan Iftar rituals under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, as well as for Hepatitis C medical treatment. Two *pro bono* attorneys were appointed to represent him on the latter claim. In light of RIDOC's adoption, on November 1, 2017, of a new policy permitting the wearing of the kufi, including at the Ramadan Iftar ritual, as well as its decision to provide Plaintiff with appropriate Hepatitis C treatment, Plaintiff's motion for preliminary injunction was denied. Wall, 2017 WL 6459447, at *1 (D.R.I. Dec. 18, 2017). Now pending in Wall is Plaintiff's motion for partial summary judgment seeking a declaration of liability supporting money damages based on his claim of a First Amendment violation arising from his inability to wear the kufi during the 2016 and 2017 Ramadan Iftar rituals. Wall at ECF No. 77.

## II.     Standard of Review

In considering a Fed. R. Civ. P. 12(b)(6) motion, the Court must accept all the well-pleaded factual allegations as true and must draw all reasonable inferences favorable to the plaintiff but need not credit bald assertions or legal conclusions. See Iqbal, 556 U.S. at 678. The

complaint "must allege 'a plausible entitlement to relief' in order to survive a motion to dismiss." Bell Atl. Corp. v. Twombly, 550 U.S. 559 (2007); Pepin, 2017 WL 5197880, at *2. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The Court must take all such well-pled facts as true and construe reasonable inferences in the plaintiff's favor. Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 53 (1st Cir. 2013). Nevertheless, mere conclusions are not entitled to any presumption of truth. Iqbal, 556 U.S. at 678-79. Thus, a conclusory pleading that an official was the "architect" of an invidious policy, or was "instrumental" in adopting and executing it, amounts to nothing more than a "formulaic recitation of the elements" of a constitutional claim and is not entitled to "the presumption of truth." Iqbal, 556 U.S. at 680-81.

Relatedly, Fed. R. Civ. P. 8(a)(2) requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive scrutiny under Fed. R. Civ. P. 8(a), a pleading must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555. It "should at least set forth minimal facts as to who did what to whom, when, where, and why." Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004). Although Fed. R. Civ. P. 8(a) allows flexibility in pleading, it does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 550 U.S. at 648-49; see Cintron-Luna v. Roman-Bultron, 668 F. Supp. 2d 315, 318 (1st Cir. 2009) (Fed. R. Civ. P. 8(a) dismissal is generally "reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised"); Gordon v.

Crouchley, 554 F. Supp. 796, 797 (D.R.I. 1982) ("Although the complaint is painted on a broad canvas, in a dazzling array of variegated hues, it lacks legal artistry.").

A complaint brought by a *pro se* plaintiff should be liberally construed and held to a lower standard of pleading than is applied to those prepared by lawyers. Tucker v. Wall, No. 07-406 ML, 2010 WL 322155, at *8 (D.R.I. Jan. 27, 2010). Nevertheless, the less stringent pleading standard does not mean that a *pro se* complaint is held to no standard. Green v. Massachusetts, 108 F.R.D. 217, 218 (D. Mass. 1985). "[C]omplaints which ramble, which needlessly speculate, accuse and condemn, and which contain circuitous diatribes far removed from the heart of the claim do not comport with these goals and this system; such complaints must be dismissed . . . ." Id. (quoting Prezzi v. Berzak, 57 F.R.D. 149, 151-152 (S.D.N.Y. 1972)).

### III. Analysis

#### a. Counts I-IV (Conditions of Confinement/Cold and Mold)

##### *Facts*

In Count I, Plaintiff complains that, since he arrived in Max, beginning in May 2014, on orders from Defendant Kettle, RIDOC policy has required maintenance staff to turn off the heat in Max in May, open all the windows and leave them open until September or October. ECF No. 1 ¶¶ 18-25, 32-33. When the windows are open in the spring and fall, the temperature in the cell block may dip down to the 40° to 50° range. Id. ¶¶ 28-31. Plaintiff believes that the cold adversely affects his osteoarthritis and circulation. Id. ¶¶ 47-51. In addition, Plaintiff has contracted pneumonia at least three times. Id. ¶¶ 52. Exacerbating the effects of the open window policy is the summer uniform policy, which is challenged in Count II. Id. ¶¶ 64-102. Count II alleges that this policy, also adopted and enforced by Defendant Kettle, applies during

the same months when the windows are open.  Id. ¶¶ 64-92.  The policy requires inmates to wear

only thin cotton pants and a short-sleeved, collarless shirt when they leave their cells, even on the

colder spring and fall days when correctional officers are wearing coats, hats and gloves.  Id. ¶¶

82-92.  The open window and summer uniform policies have caused Plaintiff to feel as if he is

being tortured due to extreme discomfort and emotional distress, in violation of his rights under

the Eighth Amendment.  Id. ¶¶ 64-102, 340-67.

The Complaint describes that Plaintiff has received extensive medical attention and

treatment for the conditions he links to Max's cold temperatures, ECF No. 1 ¶ 107 (RIDOC's Dr.

Blanchette), ¶¶ 108-14 (RIDOC's Dr. Vohr), ¶ 115 (ENT specialist Dr. MacMillan), ¶ 116

(diagnostic tests performed by board-certified allergist and ENT specialist), ¶ 130-34 (ENT

specialist Dr. Colson), ¶ 152 (listing many blood tests), yet it does not allege that any medical

professional has linked his respiratory problems, pneumonia, circulation issues or osteoarthritis

to these policies.  Nor has any medical professional recommended or advised that he be moved

to a warmer facility or be allowed to wear different clothing.  Further the Complaint does not

allege that the occasional chilly temperatures in the late spring and early fall amount to a

"dangerously cold" condition.  See Pepin, 2017 WL 5197880, at *5.

Count III focuses on what Plaintiff claims is a black mold infestation "on walls and other

surfaces in Max."  Id. ¶¶ 118, 125-27, 149.  According to Count III, in 2016, Defendant Kettle

considered Plaintiff's complaints about mold and advised him that Max was being cleaned and

inspected daily.  ECF No. 1-1 at 9.  And in April 2017, in response to another inmate's

complaint, RIDOC officials, including Defendant Kettle, engaged a Department of Health

industrial specialist to inspect portions of the facility and prepare a report.  ECF No. 1 ¶¶ 146-49;

ECF No. 1-1 at 25-30 ("Inspection Report").  Following an extensive inspection (and a private

interview with the complaining inmate), DOH issued its Inspection Report, which concludes that, despite cleaning efforts by RIDOC, the shower area still had an accumulation of black mold. The Report recommends the use of diluted chlorine and an upgrade to the shower-area ventilation system; no other areas are mentioned as contaminated by black mold. ECF No. 1-1 at 30. The Report does not conclude that the amount of mold rendered the area uninhabitable or hazardous to health; nor does the Complaint plead any other contemporaneous fact permitting that inference. Instead, Count III cites to the pre-1977 findings in <u>Palmigiano v. Garrahy</u>, 443 F. Supp. at 964, that Max is unfit for human habitation, and alleges that RIDOC's failure to transfer Plaintiff to a mold-free facility violates his rights under the Eighth Amendment. ECF No. 1 ¶¶ 368-82. Defendant Aceto is named for denying Plaintiff's grievance seeking transfer. ECF No. 1 ¶ 143.

Count IV is related to Count III; it charges that, since he moved into Max in early 2014, Plaintiff has experienced allergy and respiratory problems, which he believes are caused by the mold. ECF No. 1 ¶ 105. This allegation is buttressed by Plaintiff's claim that, on September 19, 2014, now-retired ACI physician Dr. Vohr told him that his allergic symptoms were "probably caused by mold in this old building." ECF No. 1 ¶ 113. However, the Complaint does not allege that Dr. Vohr advised that he be moved to a mold-free unit. Rather, invoking the Eighth Amendment, the Complaint claims that, despite all of the diagnostic tests and medical examinations, RIDOC's medical treatment remains constitutionally deficient because it did not arrange for testing to isolate the specific material to which Plaintiff is allergic. ECF No. 1 ¶¶ 106-59, 386. The Complaint is also inconsistent in that it alleges that Plaintiff did receive "a skin test performed by a board certified allergist on 08/01/16." <u>Id.</u> at ¶ 116. Otherwise, the Complaint reflects the medical opinions of Drs. Vohr and Melnick declining to order allergen-

12

specific testing. ECF No. 1 ¶ 114 (Dr. Vohr stated, "I am not a fan of allergy testing"); ¶ 150 (Dr. Melnick "would not perform [such] test(s)").[7]

The claims in these four Counts are leveled against Defendants Raimondo, Wall and Kettle;[8] Defendant Aceto is named only in Counts I and II. The only factual allegations mentioning Defendants Raimondo and Wall assert that they (along with Defendants Kettle and Aceto) are responsible under state law to implement habitable housing conditions and responsible for implementing the open window/summer clothing policies; that Plaintiff sent them letters complaining of the cold and mold that he alleges make Max uninhabitable; and that Defendant Wall has the authority to move Plaintiff to a different facility. ECF No. 1 ¶¶ 128-29, 139, 142, 341. Only Defendant Kettle and Aceto are alleged to have had any direct involvement in the operative events.

### Eighth Amendment

A prison-conditions claim states a violation of the Eighth Amendment's prohibition on "cruel and unusual punishments" when two requirements are met. First, "the alleged deprivation of adequate conditions must be objectively serious, that is, the conditions of confinement must have deprived the plaintiff of 'the minimal civilized measure of life's necessities.'" Restucci v. Clarke, 669 F. Supp. 2d 150, 155 (D. Mass. 2009) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Second, the "plaintiff must allege that the official involved acted with 'a sufficiently culpable state of mind,' namely, a 'deliberate indifference.'" Restucci, 669 F. Supp.

---

[7] After filing his Complaint, Plaintiff filed a motion for interim injunctive relief in this case; the motion includes a note dated October 23, 2017, from yet another appointment with the ENT specialist, Dr. Colson, which reflects another order for a "skin test." ECF No. 19-3 at 24. Since the Complaint reflects that Plaintiff already had a skin test in August 2016, ECF No. 1 ¶ 116, the new order does not provide additional support for Plaintiff's Eighth Amendment claim.

[8] Count IV also names the medical provider defendants, Drs. Clarke and Melnick. Because they have not joined the Motion, they are not mentioned above.

2d at 155-156 (citing Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999)).  It is well settled that the conduct of prison officials who expose prisoners to objectively extreme cold or provide objectively inadequate clothing can rise to the level of seriousness and deliberate indifference as to transgress the Eighth Amendment.  See, e.g., Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997) (endurable temperature is generally considered to be one "the minimal civilized measure of life's necessities") (quoting Farmer v. Brennan, 511 U.S. 825, 833-34 (1994)); Gordon v. Faber, 800 F. Supp. 797, 800 (N.D. Iowa 1992) (exposure to extreme cold may be actionable). On the other hand, the mere presence of mold or occasional temperatures below 65° are insufficient to indicate an objectively serious deprivation of life's necessities.  Skandha v. Savoie, 811 F. Supp. 2d 535, 540 (D. Mass. 2011) (cold temperature must pose danger and be ignored by officials to trigger Eighth Amendment violation); Forde v. Fischer, No. 08-5026 (JAG), 2009 WL 5174650, at * 4 (D.N.J. Dec. 16, 2009) (presence of mold in cell without facts establishing health hazard not enough to trigger Eighth Amendment claim).

Relatedly, the Eighth Amendment places a duty on prison officials to "ensure that inmates receive adequate . . . medical care."  Farmer, 511 U.S. at 832.  For a complaint of failure to provide medical treatment to violate the Cruel and Unusual Punishments clause, the official must be "deliberate[ly] indifferent" to the "serious medical needs of prisoners."  Id. at 834, 835. Mere negligence is insufficient.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  As with the other Eighth Amendment claims, the plaintiff must satisfy both a subjective and objective inquiry. Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011).  The subjective "deliberate indifference" inquiry is met by showing that "the treatment provided [was] so inadequate as to 'constitute an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" id., while the objective inquiry requires a medical need that is serious, in that it either

"has been diagnosed by a physician as mandating treatment, . . . [or] is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. at 497-98 (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).

Pepin is instructive because it addresses Plaintiff's essentially identical claims based on Eighth Amendment allegations of adverse medical effects from exposure to cold temperatures and mold in Max.  Pepin, 2017 WL 5197880, at *3-5.  The Court rejected these claims as futile and denied Plaintiff's motion to amend.  First, the Court noted that Plaintiff had not pled that his cell was "dangerously cold."  Id. at *5 (quoting Skandha, 811 F. Supp. 2d at 540).  Second, the Court relied on the factual allegation establishing that RIDOC had checked the temperature in his cell and the surrounding cells, which led the Court to conclude that prison officials had not "failed to act despite their knowledge of a substantial risk of serious harm."  Pepin, 2017 WL 5198181, at *1 (citing Farmer, 511 U.S. at 842).  The same legal principles are applicable to Plaintiff's assertion of the same claims here.

For starters, the Complaint unquestionably alleges that conditions in Max inflicted significant discomfort, experienced subjectively by Plaintiff as "torture."  Nevertheless, Counts I, II and III do not appear to plead plausible facts permitting the inference that the challenged conditions, objectively, were worse than uncomfortable; that is, the Complaint fails plausibly to allege that temperatures were so cold and mold was so severe as to pose an objective threat of substantial harm.  Leavitt, 645 F.3d at 497; see Del Raine v. Williford, 32 F.3d 1024, 1035 (7th Cir. 1994) (only extremely low cell temperature can constitute Eighth Amendment violation).  To the contrary, the Complaint establishes that the open window/summer uniform policies have been employed in an identical fashion year after year, and that mold has been present in Max year after year.  Plaintiff has complained of the same discomfort year after year, and Plaintiff has

had extensive medical diagnostic testing and treatment regarding those complaints from many physicians, including multiple specialists, both inside and independent of RIDOC, year after year. Yet, not one of those physicians has advised that the temperature, the summer uniform policy or the mold (or other allergens) at Max are objectively detrimental to Plaintiff's health. Further, while treatment has been recommended for the allergies, which are plausibly linked to the mold, no medical professional has prescribed that Plaintiff should be transferred to a different environment. Rather, as in <u>Pepin</u>, the Complaint establishes only that Plaintiff would like to be transferred to more desirable housing, 2015 WL 5197880, at *5, but lacks plausible factual allegations permitting the inference that the cold and the mold have deprived him of "the minimal civilized measure of life's necessities." <u>Restucci</u>, 669 F. Supp. 2d at 155-56.

Count IV is similarly deficient in failing to plead sufficient facts establishing a serious unmet medical need. Citing <u>Farmer</u>, Count IV bases its Eighth Amendment claim on the refusal by Drs. Vohr and Melnick to comply with Plaintiff's request for testing to isolate the allergen causing his respiratory discomfort. This claim is premised on Plaintiff's plausible assumption, confirmed by Dr. Vohr, that his allergies may be caused by the mold. He posits that RIDOC will not permit the testing to confirm that the mold in Max is causing his allergic reaction because it would then have to transfer him to an allergen-free facility. As with Counts I-III, this claim founders on the facts in the pleading, which establish that Plaintiff has been seen by at least three independent specialists, one of whom (a board-certified allergist) did perform a skin test in 2016, yet no provider has prescribed the additional testing sought by Count IV, while the two non-specialists (Drs. Vohr and Melnick) considered Plaintiff's request but declined to order further testing. ECF No. 1 ¶¶ 114, 150-51.

Even if the Court were satisfied with the adequacy of Plaintiff's pleading of conditions causing objectively serious harm, Plaintiff's Eighth Amendment claims are nevertheless subject to dismissal because the Complaint fails to plead deliberate indifference by RIDOC.  As in Pepin, the pleading is replete with descriptions of the actions taken by RIDOC to respond to Plaintiff's concerns regarding the cold and the mold, particularly by providing Plaintiff with access to the many health care providers who examined, tested and treated him for the allergies and illnesses he claims were caused by these conditions.  Further, far from demonstrating deliberate indifference to the possibility of mold in Max, the Complaint establishes that Max is routinely cleaned, and that, when another inmate complained, RIDOC brought in an expert from the Health Department to perform an independent inspection.  Thus, the Complaint paints RIDOC (acting through Defendant Kettle) as an agency that is attentive to possible risks from mold and other allergens.  It also establishes that the resulting Report recommended more rigorous cleaning of the shower area, but did not conclude that Max is uninhabitable or that the mold found in the shower area is dangerous to the health of inmates.

Based on the foregoing, I recommend that Counts I-IV be dismissed for failure to state a claim because they do not plausibly allege that either the open window/summer uniform policies or Max's mold problem amount to objectively serious conditions nor that any RIDOC official acted with deliberate indifference to such conditions.  Relatedly, I recommend that Count IV be dismissed for failure to state a claim because it describes extensive medical diagnostics and treatment received by Plaintiff and is devoid of any allegation that RIDOC ever failed to provide prescribed treatment or was deliberately indifferent to Plaintiff's serious medical needs.  Finally, the Fed. R. Civ. P. 8(a) defendant-by-defendant analysis to determine whether Plaintiff has given fair notice as to each regarding "who did what to whom, when, where, and why," reveals that,

apart from the non-moving medical defendants, only Defendants Kettle and Aceto are mentioned as having committed any of the acts or omissions in connection with these claims. See Iqbal, 556 U.S. at 678; Educadores Puertorriquenos, 367 F.3d at 68. If the Court rejects my recommendation and allows these claims to proceed, I recommend that individual capacity claims continue only against Defendants Kettle and Aceto, and that the individual capacity claims against Defendant Wall be dismissed.

### *Res Judicata/Release*

Also fatal to Counts I-IV is Piccirillo, in which Plaintiff sued Defendant Wall (among others) and which ended in final judgment on the merits. The Piccirillo complaint, as supplemented,[9] brought Eighth Amendment claims essentially identical to those in Plaintiff's 2017 Complaint, in that both cases challenge conditions of confinement based on the adverse health effects of the open window and summer uniform policies, and the environmental allergens present at Max. Both complaints allege that these conditions of confinement began in early 2014; each alleges that the conditions continued unchanged through the filing of the respective pleadings.

There is no need to speculate about the claim-preclusive effect of Piccirillo: the First Circuit held that the settlement precludes Plaintiff from "turning around and re-filing some of the very same claims based on pre-settlement acts or omissions of defendants." Piccirillo at ECF No. 64. This holding is based on doctrine of *res judicata*, which prevents parties from relitigating matters that have already been litigated or claims that could have been litigated in the initial proceeding. See Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2305 (2016)

---

[9] To perform a *res judicata* analysis on a motion to dismiss, the Court may take judicial notice of documents in the public record, including the court's docket and public filings. Ashbourne v. Hansberry, 245 F. Supp. 3d 99, 103 (D.D.C. 2017).

("the doctrine of claim preclusion (the here-relevant aspect of *res judicata*) prohibits 'successive litigation of the very same claim' by the same parties"); Kevin M. Clermont, Res Judicata as Requisite for Justice, 68 Rutgers U.L. Rev. 1067, 1107 (2016). Piccirillo ended in final judgment on the merits. Both the claims in Piccirillo and the present claims "derive from a common nucleus of operative facts,"[10] Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 755 (1st Cir. 1994); both seek redress for the same wrong, Kale v. Combined Ins. Co. of Am., 924 F.2d 1161, 1166 (1st Cir. 1991); and both name former Director Wall as a defendant, sued as a representative of the same government. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403 (1940). Accordingly, *res judicata* acts as a bar to the present claims, at least for the period through the date of settlement, or more properly, the date on which the District Court held the settlement to be enforceable (June 12, 2015). Piccirillo, 2015 WL 3700796, at *3. Thus, to the extent that the Complaint seeks injunctive or declaratory relief based on the policies (open window/summer uniform) and conditions (mold) that it alleges existed prior to June 12, 2015, or seeks damages caused by the effects of RIDOC's acts and omissions in implementing those policies and ignoring those conditions before June 12, 2015, all such claims are barred by the preclusive effects of the final judgment on the merits of identical claims based on identical factual transactions in Piccirillo. See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 327-28 (1st Cir. 2009) (affirming dismissal of all claims of violation of First Amendment rights derived from same factual transaction as claim in state court action).

---

[10] As the Restatement (Second) of Judgments § 24(2) (1982) makes clear, a claim may encompass a "series of connected transactions, out of which the action arose." See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 328 (where prior case raised constitutional deprivation in 2004 and subsequent case raised same constitutional deprivation repeated in 2005, *res judicata* bars second case because it relies on "allegation of a series of closely related events") (citing Restatement (Second) of Judgments § 24 (1982)). Therefore, judgment on the merits for part of the series bars a new action on a subsequent part of the same series unless there are new material facts sufficient that the new case and the previous case do not present the same claim. Whole Woman's Health, 136 S. Ct. at 2305.

There is one difference between Piccirillo and the instant Complaint that requires further examination. Piccirillo does not mention mold. However, the Piccirillo complaint did allege that Plaintiff suffered from respiratory symptoms ("lung disorders") that Dr. Vohr advised on September 19, 2014, were likely caused by "some environmental allergin [sic]" at Max. Piccirillo at ECF No. 1 ¶¶ 110-11, 163. In the instant Complaint, Plaintiff alleges that he suffered from respiratory symptoms that Dr. Vohr advised on September 19, 2014, were likely caused by "mold" at Max. ECF No. 1 ¶ 110-13. It is clear that the two pleadings are referring to the precise same communication with Dr. Vohr. Thus, although Piccirillo does not name the allergen as mold, it is plain that the operative fact on which both claims are based is identical. Accordingly, like the open window/summer uniform policy claims in Counts I-II, at least through the date of the settlement, the Eighth Amendment mold claims in Count III-IV are precluded by the final judgment on the merits of the Eighth Amendment "environmental allergen" claim in Piccirillo. See United States v. Tohono O'Odham Nation, 563 U.S. 307, 316 (2011) ("The now-accepted test in preclusion law for determining whether two suits involve the same claim or cause of action depends on factual overlap, barring 'claims arising from the same transaction.'").

That leaves the question whether Plaintiff is also barred from asserting claims based on the post-settlement continuation of the open window/summer uniform policies and the mold condition, both of which the Complaint alleges remained unchanged after Piccirillo terminated. Piccirillo is based on allegations beginning in 2014 through March 2015 (when the complaint was supplemented); the Piccirillo settlement was finalized in June 2015. In reliance on Plaintiff's voluntary dismissal with prejudice of the litigation and extinguishment of his claims for damages and injunctive relief, RIDOC agreed to perform, and was still performing, its

settlement obligations through the end of 2016.  Ongoing litigation to enforce the settlement

continued through December 2016.  The Complaint is based on precisely the same policies and

conditions as those challenged in Piccirillo, except that, according to the Complaint, they

persisted unchanged, causing identical injury to Plaintiff, after the termination of Piccirillo in

mid-2015 through to September 2017 when the Complaint was filed.

The Restatement of Judgments contemplates that a judgment for an ongoing tort (such as

a continuing discharge of noxious gas) encompasses the entire claim, both past and into the

indefinite future, unless the judgment provides otherwise.  Restatement (Second) Judgments § 25

Comment *c*, Illustration 6, at 212 (1982).  Nevertheless, many cases hold that *res judicata* does

not apply to damages incurred in the post-judgment period, even though they are based on pre-

judgment acts and omissions, based on the finding that such damage claims could not have been

raised in the prior action.  Pena-Barrero v. City of New York, 14-CV-9550 (VEC), 2017 WL

1194477, at *9 (S.D.N.Y. Mar. 30, 2017), aff'd, __ F. App'x __, 2018 WL 1181180 (2d Cir.

Mar. 7, 2018); see Havercombe v. Dep't of Educ., 250 F.3d 1, 9 (1st Cir. 2001) (*res judicata* bars

claim for continuing damages based on pattern and practice of improper acts adding up to a

single claim of workplace harassment through entry of final judgment).  In Whole Woman's

Health, Justice Breyer, writing for the Court, explained that the linchpin of whether future

injuries from a continuing tort are barred by claim preclusion fixes on whether there are

"[m]aterial operative facts occurring after the decision of an action with respect to the same

subject matter."  136 S. Ct. at 2305 (citing Restatement §24, Comment *f*).  Whole Woman's

Health illustrates the distinction with a hypothetical: if the claim of prisoners that they were

forced to drink contaminated water is dismissed because the claimed harm is not severe enough

to be unconstitutional, the prisoners are barred from bringing a claim challenging the same

ongoing contamination, but may sue again if time and experience show that prisoners are dying from contaminated water, which amounts to a sufficiently changed circumstance as to constitute a new claim.  Id.  From this perspective, Whole Woman's Health compels the conclusion that *res judicata* should bar Plaintiff's claim for damages incurred after June 12, 2015, because the open window/summer uniform policies and the mold, and their impact on Plaintiff, continued unchanged after the termination of Piccirillo.  That is, the Complaint lacks post-June 2015 material facts sufficient to give rise to a new claim.

Nor does *res judicata* end the analysis.  In S. Kingstown Sch. Comm. v. Joanna S., the First Circuit examined the preclusive effect of a settlement agreement terminating an administrative proceeding that had resolved a student's claim for certain educational evaluations. 773 F.3d 344, 353-55 (1st Cir. 2014).  In considering the viability of a claim for the same evaluations asserted soon after the settlement, but affecting post-settlement school years, the court held that analysis was more appropriately focused on whether the claimant had "released" the claim for more educational evaluations.  Id. at 353-54.  Viewed through the lens of release *vel non*, the effect of the settlement agreement turns on the scope of its language.  Id. at 353. Because it was susceptible of interpretation as forward looking, the court held that the new claim for the same evaluations would be released unless based on "changed circumstances."  Id. at 354 (settlement agreement is "best read to release any post-settlement rights except when the post-settlement request arises "from a change in the conditions that prevailed at the time [the claimant] signed the Agreement").

Here, the Piccirillo settlement clearly contemplated that its effect would be forward looking in that RIDOC's performance of its Piccirillo duties, both as to the provision of medical treatment and as to reconsideration of inmate clothing policies, would occur after the settlement

agreement. RIDOC's performance was still in progress through the end of 2016. Further, it is clear that the Piccirillo settlement agreement would be meaningless if, at the same time that RIDOC was providing him with specified medical treatment and reconsidering its clothing policies with his input, Plaintiff could turn around and file a new claim for money damages based on the same policies and conditions. S. Kingstown Sch. Comm., 733 F.3d at 354 (school district's consent to settlement "would be meaningless if she could nonetheless turn around the next day and demand the foregone evaluations anew"). Therefore, the language of the Piccirillo settlement is also properly interpreted as releasing a new claim for damages based on pre-settlement policies and conditions unless the claim rests on changed circumstances different from those prevailing at the time of the settlement. See id. at 354. This interpretation is consistent with the holding in Piccirillo that the settlement agreement "forecloses the possibility of receiving money damages at a later time based on the same claims." Piccirillo, 2015 WL 3700796, at *2.

The First Circuit has emphasized that "[r]es judicata is not merely a legal technicality. Rather, the doctrine is rooted in essential considerations of fairness and judicial economy." Sutliffe, 584 F.3d at 329. The doctrine's focus is on protecting litigants from the burden of relitigating an identical issue with the same party or his privy and on promoting judicial economy by preventing needless litigation, because it would be "unfair but also wasteful for plaintiffs to be allowed to take another shot at these same claims . . . ." Id. In this case, as pled, Plaintiff's Complaint does not identify any new material operative facts or any changed circumstances potentially giving rise to new claims; therefore, it unfairly exposes RIDOC to the burden of relitigating an identical claim. Accordingly, the claim preclusion doctrine of *res*

*judica*, coupled with the effect of the release arising from the <u>Piccirillo</u> settlement agreement, together require that Counts I-IV should be dismissed in their entirety. I so recommend.

### b. Counts V-VII (Religious Practice)

Counts V, VI and VII seek damages for emotional distress caused by the limitations RIDOC placed on Plaintiff's ability to engage in certain Muslim practices.[11] Specifically, the Complaint is based on the suspension of the weekly Jumu'ah prayer services[12] for several months during 2016 and 2017 and on the prohibition on wearing of the kufi during the 2017 Iftar ritual of Ramadan. Although both of these limitations on Muslim religious practice have ended, Counts V-VI seek a mandatory injunction requiring RIDOC to create procedures to guarantee that Jumu'ah services are never cancelled in the future, while Count VII asks the Court to declare that RIDOC's now-abandoned kufi prohibition is a violation of the Free Exercise clause of the First Amendment.

Counts V-VI focus principally on an eight-month period between October 1, 2016, and May 25, 2017, during which RIDOC apparently had trouble finding an Imam to conduct services; as a result, no weekly Jumu'ah prayer services were conducted in Max. ECF No. 1 ¶ 180. Pointing out that President Trump called for a "Muslim Ban" beginning in the summer of 2016, and just a few months later Jumu'ah services were suspended for eight months, <u>id.</u> ¶ 172, as well as that Christian and Catholics services were conducted during the same period, Plaintiff charges that the cancellation of services amounted to a constitutional deprivation of his First Amendment rights, as well as his Fourteenth Amendment right to equal protection of the law.

---

[11] This Court has previously found that Plaintiff's religious belief as a Muslim is sincerely held. <u>Wall</u>, 2017 WL 6459447, at *1.

[12] The Islamic faith mandates a weekly service known as Jumu'ah that is central to the faith's observance. <u>Salahuddin v. Coughlin</u>, 993 F.2d 306, 307 (2d Cir. 1993). Jumu'ah must be held on Friday afternoons and be performed as a group. <u>Id.</u>; <u>see Knapp v. Kench</u>, No. 11-cv-491-PB, 2012 WL 2061701, at *2 (D.N.H. May 14, 2012).

ECF No. 1 ¶¶ 393-401, 403-11.  In support of these claims, Plaintiff attaches a response to his

April 2017 complaint, in which Defendant Weiner writes that he was "very concerned that

[resumption of regular Jumu'ah prayer] has not occurred since our Imam unexpectedly left us"

and expressed hope that a new Imam "should be on board by the end of the week," as well as

that "another staff member will be made available to supervise the prayer sessions until he is on

board."  Id. ¶¶ 182-87; ECF No. 1-1 at 31-34.  Yet, despite the representation that staff could

supervise so services would resume, there was another month of delay and further interruptions

to regular services during the summer of 2017.  ECF No. 1 ¶¶ 180, 188, 193.  Citing Spratt v.

R.I. Dep't of Corr., 482 F.3d 33 (1st Cir. 2007), Plaintiff points out that, during the search for a

new Imam, these services could have been (and in the past had been) led by prisoners, including

by Plaintiff, supervised by staff as Defendant Weiner acknowledged.  Id. ¶¶ 166-70.  Plaintiff

filed a grievance, to which Defendant Aceto responded by advising that the interruption in

services had been caused by the prior Imam's failure to perform his duties, resulting in his

dismissal, and that Muslim inmates were permitted to pray in their cells while RIDOC searched

for a replacement.  Id.  ¶¶ 189-92; ECF No. 1-1 at 35.

Grounded in the First Amendment, Count VII is based on Plaintiff's inability to wear his

kufi at the 2017 Iftar ritual during Ramadan.  ECF No. 1 ¶¶ 207-25.  Like Counts V and VII, it is

based on a past injury in that RIDOC changed its policy in November 2017, and now permits the

kufi to be worn.  Wall, 2017 WL 6459447, at *1 (Plaintiff's motion for preliminary injunction

seeking order to permit wearing of kufi at 2018 Iftar ritual during Ramadan denied in light of

RIDOC adoption of policy change).  Plaintiff grieved the prohibition against kufi-wearing,

drawing a denial from Defendant Aceto.  ECF No. 1 ¶¶ 212-17.

Counts V and VII implicate the Free Exercise clause of the First Amendment, which "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). "The Supreme Court has made it clear that 'prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.'" Siddiqi v. Leak, 880 F.2d 904, 908-09 (7th Cir. 1989) (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979)). "[T]he fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." DeHart v. Horn, 227 F. 3d 47, 50-51 (3d Cir. 2000) (citing Pell v. Procunier, 417 U.S. 817, 833-23 (1974)). "[R]easonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment . . . ." Cruz v. Beto, 405 U.S. 319, 322 n.2 (1972).

Count VI invokes the Equal Protection clause of the Fourteenth Amendment, which prohibits the denial of equal protection of the laws, including rights guaranteed by the First Amendment. U.S. Const. amend. XIV. An equal protection claim requires the court to determine whether the claimant was treated differently from others similarly situated and whether the difference was based on an impermissible consideration such as religion. Lopera v. Town of Coventry, 640 F.3d 388, 402 (1st Cir. 2011). Strict scrutiny must be applied to a governmental policy that impedes rights guaranteed by the First Amendment, such as the right freely to exercise one's religion. See Williams v. Rhodes, 393 U.S. 23, 31 (1968). Under a strict scrutiny standard, the government has the burden of proving that its policies are "narrowly tailored measures that further compelling governmental interests." Johnson v. California, 543 U.S. 499, 511 (2005).

The application of these principles to religious services is illustrated in a 2012 case decided in the District of New Hampshire. Knapp v. Kench, No. 11-cv-491-PB, 2012 WL 2061701, at *2-3 (D.N.H. May 14, 2012), adopted, 2012 WL 2061598 (D.N.H. June 6, 2012). In Knapp, the court faced the claim that prison policy prohibited religious services unless a chaplain or approved religious volunteer could be present; as applied, the policy resulted in Christian services being conducted while Muslim Jumu'ah services were not. Id. at *3. The court denied a motion to dismiss the Free Exercise clause claim, holding that, "without evidence to the contrary in the record, the court finds that the denial of access to Jumu'ah services denies [plaintiff] a central and essential religious practice, and thereby improperly impinges on his First Amendment right to exercise his religion." Id. However, the court granted the dismissal of the Equal Protection clause claim because the complaint did not establish that prison officials had failed to apply the policy uniformly to all prisoners, in that Christian services were routinely conducted due to the availability of the chaplain. Id. at *6.

As in Knapp, Plaintiff has plausibly pled a suspension of services for many months, amounting to a denial of an essential religious practice, with no apparent penological justification in light of the available alternative of permitting inmate-led services supervised by staff. Also as in Knapp, Plaintiff has not alleged any differences between Muslim prisoners and prisoners of other religions with respect to whether they are permitted to attend inmate-led/staff-supervised services in Max when a chaplain cannot be found. Based on Knapp, I recommend that Count V, grounded in the First Amendment, proceed. I find that the Count states plausible claims against Defendants Weiner and Aceto in their individual and official capacities, as well as against the two senior RIDOC officials (Defendants Wall and Kettle) in their official capacities. On the other hand, I recommend that Count VI be dismissed because the plausible facts do not support

an Equal Protection clause claim in that the pleading does not establish any difference based on religion in RIDOC's application of its policies concerning religious services.

The Complaint's third religious practice claim, Count VII, which concerns the right of a Muslim prisoner to wear the kufi pursuant to the First Amendment,[13] founders on the Court's 2016 decision in Harris v. Wall, 217 F. Supp. 3d 541 (D.R.I. 2016). Harris examined RIDOC's compelling interest in the safety and security of prisoners and staff and its policy banning almost all head coverings, including religious ones, such as the kufi. Id. at 547-48. Applying the stricter RLUIPA standard,[14] Harris holds that RIDOC's head covering policy, resulting in the collateral ban on wearing the kufi, was largely justified by a compelling governmental interest. Id. at 558-59. Nevertheless, based on RLUIPA's least restrictive means requirement, the Court issued a narrow injunction applicable only in the prison yard, where secular head coverings were allowed. Id. at 561-62.

As the Complaint reveals, RIDOC relied upon the holding in Harris when it denied Plaintiff's request to wear his kufi during the 2017 Iftar rituals. ECF No. 1-1 at 37-39 (supporting denial of Plaintiff's request to wear kufi by reference to Harris). Based on Harris, Plaintiff's claim that the Free Exercise clause was violated by Defendant Aceto's denial of Plaintiff's 2017 kufi request is doomed by the qualified immunity protecting state officials as long as they do not act in violation of "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

---

[13] It must be noted that there is little discernable distinction between the kufi claim in the Complaint and what remains in Wall, which is now pending before the Court on Plaintiff's motion for summary judgment. Wall, No. 16-652 WES at ECF No. 77. The exception is that Wall challenges the kufi ban at the 2016 and 2017 Iftar rituals, while the Complaint focuses only on 2017.

[14] Harris was limited to a claim for declaratory and injunctive relief and therefore was focused on the stricter standard in RLUIPA, which does not support a claim for money damages. Harris, 217 F. Supp. 3d 541, 546 n.3 (D.R.I. 2016).

Ford v. Bender, 768 F.3d 15, 28 (1st Cir. 2014). The reasonableness of RIDOC's belief that its head covering policy as applied to the 2017 Iftar ritual did not violate clearly established law is confirmed not just by Harris, on which RIDOC specifically relied, but also by the many cases leading up to May 2017 that had uniformly rejected First Amendment challenges to prison-based limitations on kufis. Harris, 217 F. Supp. 3d at 557 (listing cases). Even cases that found a potential RLUIPA violation declined to find that the First Amendment was transgressed by limits on the wearing of the kufi. Ali v. Quarterman, 434 F. App'x 322, 326 (5th Cir. 2011) (RLUIPA claims remanded but law is plain that First Amendment not violated by limits on kufis). As the court in Ajala v. West, expressed it: "I have little difficulty in concluding that the law is *not* clearly established that plaintiff has a constitutional right to wear a kufi at all times, which means that defendants are entitled to qualified immunity." 106 F. Supp. 3d 976, 988 (W.D. Wisc. 2015). Based on Defendants' entitlement to qualified immunity derived from Harris and the many cases on which it relies, Count VII should be dismissed.

Based on the foregoing, I recommend that Counts VI and VII should be dismissed, but that Count V should remain pending. As the case proceeds, further development of the record may well demonstrate that RIDOC had a legitimate penological purpose for not permitting inmate-led Jumu'ah services with staff supervision in Max during the period in issue. For now, I find that Count V alleges enough to state a claim.

### c. Counts VIII and IX (Discipline)

Counts XIII and IX allege that Plaintiff was disciplined on June 1, 2017, by the imposition of a six-day commitment to segregation.[15] Count XIII alleges that the process used to

---

[15] In the fact section of the Complaint, Plaintiff includes a lengthy description of the circumstances that caused him to lose his job and names as defendants two RIDOC officers who are mentioned only in that context (Defendants Burt and Paolello). ECF No. 1 ¶¶ 226-94. The Complaint does not assert a claim based on the loss of the job. Nor would such a consequence be actionable. Dominique v. Weld, 73 F.3d 1156, 1160 (1st Cir. 1996) (no

impose this discipline was inconsistent with the Morris Rules and the constitutional requirements of the Due Process clause of the Fourteenth Amendment. Count IX charges that the June 2017 discipline was in retaliation for Plaintiff's artwork (confiscated in 2015), Pepin, 2017 WL 5197880, at *2, and for the two lawsuits that he initiated in January 2016 (Pepin) and December 2016 (Wall). ECF No. 1 ¶ 310. Both Counts fail to state a viable claim.

The Court should give short shrift to Plaintiff's invocation of the Morris Rules. As recently held in Pona v. Weeden, it is well settled that this Court lacks subject matter jurisdiction over alleged violations of the Morris Rules, whether brought as a motion for contempt or as a § 1983 claim, which is what Plaintiff has asserted here. C.A. No. 16-612S, 2017 WL 3279012, at *5 (D.R.I. June 29, 2017), adopted, 2017 WL 3278874 (D.R.I. Aug. 1, 2017) (citing Cugini v. Ventetuolo, 966 F.2d 1440, *3 (Table) (1st Cir. 1992) and Akinrinola v. Wall, C.A. No. 6-370M, 2016 WL 6462203, at *1 (D.R.I. Oct. 31, 2016)).

Equally unavailing is Plaintiff's Due Process claim based on prison discipline resulting in six days of confinement. Although the Due Process safeguards Plaintiff invokes are outlined in Wolff v. McDonnell, 418 U.S. 539 (1974), a subsequent and seminal Supreme Court decision makes clear that the right to these procedures arises only if the punishment deprives the inmate of a constitutionally-protected liberty interest; that is, when prison officials impose a punishment that is "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484-86 (1995). Punishment that "falls within the expected perimeters of the sentence imposed by a court of law," does not implicate a liberty interest and due process rights do not accrue. Id. Six days of restrictive confinement is not close

---

constitutionally-protected interest in a prison job). In any event, the Complaint alleges that Plaintiff was fired from his prison job for cause after repeatedly "busying" himself in the prison's law library rather than doing any work. ECF No. 1 ¶¶ 233-46, 251-58. Because the only factual reference to Defendants Burt and Paolello is in connection with the lost job, I recommend that they be dismissed from the case.

to what has been held to be an "atypical or significant hardship."  See Skinner v. Cunningham, 430 F. 3d 483, 487 (1st Cir. 2005) (six weeks in segregation not enough to implicate liberty interest); Goddard v. Oden, No. 15-055 ML, 2015 WL 1424363, at *3 (D.R.I. Mar. 27, 2015) (thirty days not enough to implicate liberty interest); Williams v. Wall, No. 06-12S, 2006 WL 2854296, at *3 (D.R.I. Oct. 4, 2006) (twenty-one days not enough to implicate liberty interest). Accordingly, Count VIII's claim of denial of Due Process resulting in a six-day discipline is subject to dismissal for failure to state a claim.

Count IX recycles Plaintiff's challenge to the sufficiency of the process used to impose the June 2017 discipline as a claim for retaliation.  In vague and conclusory language, Count IX alleges that RIDOC's failure to follow the Morris Rules and Wolff procedures when imposing punishment was somehow linked to its lingering (since 2015) dissatisfaction with Plaintiff's artwork and with the filing of his January and December 2016 federal lawsuits.  No plausible facts are presented to buttress this conclusion, not even temporal proximity.  See Ferranti v. Moran, 618 F.2d 888, 892 n.4 (1st Cir. 1980) (inference of retaliation may be warranted from chronology of events).  Further, Plaintiff has advanced no plausible factual allegations permitting the inference that the Defendants named in Count IX (Defendants Crowley, Amaral and Kettle) were motivated to cut due-process corners based on the desire to retaliate because of the unrelated 2015 and 2016 events.  Rather, the Complaint supplies a non-retaliatory reason for the discipline imposed, in that Plaintiff alleges that he was restricted to his cell for six days as punishment for losing his ID tag.  ECF No. 1 ¶¶ 311-13.  Count IX does not permit a plausible inference of retaliation and should be dismissed.

Based on the foregoing, I recommend that the Motion to dismiss Counts VIII and IX be granted because they fail to state a claim.

### d.     Joinder of Governor Raimondo

The Complaint names Governor Raimondo as a defendant, both individually and as the senior official of the State. She asks the Court to dismiss her from the case because the Complaint fails to state a plausible claim against her.

The damage claims against the Governor in her official capacity should be dismissed on the grounds that such an action is not cognizable under Will v. Michigan, 491 U.S. 58, 65 (1989) ("a State is not a person within the meaning of § 1983"). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Id. at 71. Such a claim cannot prevail because, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Id. Accordingly, Plaintiff's official capacity damage claims against the Governor should be dismissed. Robledo v. Benevides, No. 13-604L, 2015 WL 846428, at *2–3 (D.R.I. Feb. 26, 2015). As to injunctive and declaratory claims, with the joinder of Director Wall in his official capacity, the State is implicated and joinder of the Office of the Governor is redundant. Vangel v. Aul, No. 15-43L, 2015 WL 5714850, at *7 n. 10 (D.R.I. June 19, 2015, adopted, 2015 WL 5714855 (D.R.I. Sept. 29, 2015) (prisoner bringing §1983 and RLUIPA claims denied leave to sue additional defendants in official capacities "because it would be redundant of the official capacity claims already pending against Director Wall"); Stancati v. Cty. of Nassau, No. 14-CV-2694(JS)(ARL), 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (district courts consistently dismiss official capacity claims when they are redundant). Accordingly, I recommend that Governor Raimondo in her official capacity be dismissed.

That leaves Plaintiff's claims against Governor Raimondo in her individual capacity. To survive a Fed. R. Civ. P. 12(b)(6) motion, § 1983 allegations as to each senior official must

comply with the well-settled principle that a superior officer cannot be held vicariously liable under 42 U.S.C. § 1983 on a *respondeat superior* theory, see Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir.1998), but may be found liable under § 1983 only on the basis of his/her own acts or omissions.  Stone v. Wall, No. 11-127L, 2015 WL 1137544, at *4 (D.R.I. Mar. 12, 2015); Benbow v. Weeden, No.  13-334 ML, 2013 WL 4008698, at *8 (D.R.I. Aug. 5, 2013).  As the Supreme Court made plain in Iqbal, conclusory pleading that a top official is responsible for the implementation of policy is not entitled to "the presumption of truth."  Iqbal, 556 U.S. at 680-81.  Thus, it is well settled that "not every official who is aware of a problem exhibits deliberate indifference by failing to resolve it."  Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011).

Here, beyond conclusory pleading of the causes of action (ECF No. 1 ¶¶ 341, 355, 387-91, 397-401), the Complaint has only one fact mentioning Governor Raimondo: Plaintiff alleges that he sent her an "open letter," airing his grievances.  ECF No. 1 ¶ 139.  That is not enough. See Bruyette v. Patrick, No. 13-12727-DJC, 2013 WL 6708998, at *2-3 (D. Mass. Dec. 16, 2013) (dismissing claims against Governor Patrick because no allegation that he had any direct involvement in parole revocation proceedings); Hannon v. Beard, 979 F. Supp. 2d 136, 141-42 (D. Mass. 2013) (dismissing former Governor Romney from claim that prison conditions posed unreasonable risk to health because no allegation of direct connection between conditions and Romney's conduct) (citing Twombly, 550 U.S. at 555); McLeod v. Dukakis, No. 89-0108-S, 1990 WL 180708, at *1 (D. Mass. Nov. 2, 1990) ("Governor can be held liable only if a § 1983 violation occurred under a policy or custom promulgated by him"; complaint dismissed because it makes no such allegation).  Here, there is no factual foundation exposing the Governor to § 1983 individual liability.  All claims against Governor Raimondo should be dismissed

### IV. Conclusion

Based on the foregoing, I recommend that Defendants' Motion to Dismiss (ECF No. 14) be granted in part and denied in part as follows: Counts I, II, III, IV, VI, VII, VIII and IX should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, leaving only Count V; the individual capacity claims in Count V against the two senior RIDOC officials (Defendants Wall and Kettle) should be dismissed pursuant to Fed. R. Civ. P. 8(a) because of the absence of plausible facts establishing purposeful adoption of an invidious policy as required by Iqbal; the Morris Rules claim in Count XIII should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) because the Court lacks subject matter jurisdiction; and all claims against Defendants Raimondo, Duffy, Burt and Paolello should be dismissed pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6) for failure to state a claim and because the Complaint fails to give them Iqbal-mandated "fair notice." Because it is possible that Plaintiff may be able to marshal plausible facts sufficient to overcome these deficiencies, and mindful of his *pro se* status, I further recommend that this Court provide him with thirty days from the adoption of this report and recommendation to file an amended complaint if he wishes to do so. Brown v. Rhode Island, 511 F. App'x 4, 5 (1st Cir. 2013) (per curiam). If he fails to do so, or if the amended pleading still fails to state a claim, the case should be dismissed.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
May 3, 2018